1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF TEXAS

3               SAN ANTONIO DIVISION

4  UNITED STATES OF AMERICA,   § CRIMINAL NO. 5:20-488-OLG
                               §
5                              §
                               §
   v.                          § July 1, 2022
6                              §
   KRISTOPHER SEAN MATTHEWS,   §
7                              §
   DEFENDANT.                  §

8

9

10             TRANSCRIPT OF SENTENCING
       BEFORE THE HONORABLE ORLANDO L. GARCIA
11          CHIEF DISTRICT COURT JUDGE

12  APPEARANCES:

13  For the Government:     MARK ROOMBERG, AUSA
                           BILL HARRIS, AUSA
14                         Office of US Attorney
                           601 NW Loop 410, Suite 600
15                         San Antonio, Texas 78216

16
   For the Defendant:      WARREN ALAN WOLF
17                         Law Office of Warren Alan Wolf
                           111 Soledad Street
18                         Suite 430
                           San Antonio, TX 78205
19

20

21

22

23

24
   Produced by mechanical stenography; computer-aided
25  transcription

2

(In open court.)

         THE COURT SECURITY OFFICER:  All rise.

         THE COURT:  Okay.  You may be seated.  Thank you.  We will have announcements today.  We'll begin with -- okay.

         U.S. versus Christopher Sean Matthews.

         MR. ROOMBERG:  Good morning, Your Honor.  Mark Roomberg and Bill Harris for the United States.

         THE COURT:  Mr. Harris.

         MR. HARRIS:  Good morning, Your Honor.

         THE COURT:  And who is the young lady to your left?

         MR. ROOMBERG:  This is special agent Shannon. She is the case agent.

         THE COURT:  Okay.  Thank you.

         MS. SHANNON:  Good morning, Your Honor.

         THE COURT:  Good morning.

         MR. WOLF:  Warren Wolf for Mr. Matthews.  May I approach, Your Honor?

         THE COURT:  May you what?

         MR. WOLF:  Approach.

         THE COURT:  Okay.  It's kind of early for that.  But sure.  Come on down.

         (At sidebar.)

         MR. WOLF:  Good morning.

         THE COURT:  Who are those people back there?

         MR. ROOMBERG:  I think they're law clerks.

```
 1                    THE COURT:  What do you have?
 2                    MR. WOLF:  Judge, due to the sensitive nature --
 3                    THE COURT:  The what?
 4                    MR. WOLF:  Due to the sensitive nature of my argument
 5       in this case.
 6                    THE COURT:  Due to what?
 7                    MR. WOLF:  Sorry.
 8                    THE COURT:  I'm sorry.  Go ahead.
 9                    MR. WOLF:  Due to the sensitive nature of my
10       arguments in this case, Mr. Matthews cooperation, I would
11       prefer that he either go second.  And he would be alone in the
12       courtroom or that his co-defendant.
13                    THE COURT:  That's why I asked.
14                    MR. WOLF:  I had mentioned this to Ms. Urrutia, and
15       she said to bring it.
16                    THE COURT:  To the government.
17                    MR. WOLF:  No, to your courtroom deputy.
18                    THE COURT:  Okay.  Courtroom deputy.  Okay.
19                    MR. WOLF:  She said to bring it to your attention.
20                    THE COURT:  You don't want to say -- well, I know.
21       You already told me.  So I will say:  Do you have anything,
22       other than what we have discussed?  So you don't need to tell
23       me he cooperated.
24                    MR. WOLF:  That's true.
25                    THE COURT:  Right.
```

1          MR. WOLF:  You already have that in my memo.

2          THE COURT:  I have that information.

3          MR. WOLF:  Yes.

4          MR. ROOMBERG:  Your Honor, we don't see a need to

5  separate it.  If there would be any other thing that could be

6  discussed in detail, we would come up to the bench as always.

7          THE COURT:  M-hm.

8          MR. ROOMBERG:  And in this case, the fact that -- as

9  it stands now, Mr. Matthews has been cooperating, but we're not

10  giving K -- he's not done cooperating.  And until he's finished

11  and he's fulfilled his --

12          THE COURT:  You'll give him a Rule 35.

13          MR. ROOMBERG:  -- we'll give him a Rule 35 down the

14  road.  But right now we're asking for the guidelines so.

15          THE COURT:  Okay.  Do you understand that?

16          MR. WOLF:  Yes.

17          THE COURT:  Okay.  All right.  Let's go.

18          (End of sidebar.)

19          THE COURT:  Christopher Sean Matthews.  Cause Number

20  20-CR-488.  Let me ask you, Mr. Matthews, have you had an

21  opportunity to review the presentence report prepared in your

22  case?

23          DEFENDANT MATTHEWS:  To be honest, Your Honor, I

24  really don't --

25          THE COURT:  I can't hear you.

1              DEFENDANT MATTHEWS:  -- I really don't understand.

2              THE COURT:  Fine.  Take your mask off.

3              DEFENDANT MATTHEWS:  Yes, sir.

4              THE COURT:  You honestly don't what?

5              DEFENDANT MATTHEWS:  You said the presentence report.

6              THE COURT:  This is a document like this that I now

7    hold in my right hand.  Have you reviewed this report with your

8    lawyer?

9              DEFENDANT MATTHEWS:  Okay.  Yes, sir.  Okay.

10             THE COURT:  Okay.  So you understand the report?

11             DEFENDANT MATTHEWS:  Yes, sir.

12             THE COURT:  And you reviewed it with your lawyer?

13             DEFENDANT MATTHEWS:  Yes, sir.

14             THE COURT:  And you understand the contents of the

15   report?

16             DEFENDANT MATTHEWS:  Yes, sir.

17             THE COURT:  Do you have any questions about the

18   report?

19             DEFENDANT MATTHEWS:  No, sir.

20             THE COURT:  Is that a yes or a no?

21             DEFENDANT MATTHEWS:  No, sir.

22             THE COURT:  You have no questions?

23             DEFENDANT MATTHEWS:  No, sir.

24             THE COURT:  Okay.  Good.  There being no objections,

25   the applicable guidelines are offense level 42, criminal

1    history six, capped -- guidelines is capped at 240 months,

2    which is 20 years.

3              Supervised release one to three years.

4              There will be no fine, as recommended by the

5    probation department.

6              And there's a 100-dollar special assessment due

7    immediately.

8              What says -- hold on a second.  Okay.  What says the

9    government by way of allocution?

10             MR. ROOMBERG:  Your Honor, the guidelines actually

11   for the defendant are 360 to life.

12             THE COURT:  M-hm.

13             MR. ROOMBERG:  Because he took an early plea, he's

14   capped at 240.

15             THE COURT:  Right.

16             MR. ROOMBERG:  We believe that at this time 240

17   months is the appropriate sentence.

18             THE COURT:  And can you tell me the particular

19   reasons they should be capped -- not capped.  But why it should

20   be 20 years.

21             MR. ROOMBERG:  Your Honor, this is a case providing

22   material support to ISIS.  In regard to both the defendants,

23   but I'll specify with Mr. Matthews, they sought to have a chat

24   room where they recruited other individuals to the ISIS cause.

25   ISIS is a designated foreign terrorist organization.  And not

1    only did they try to recruit other people, they discussed

2    different attack plans that they wanted to do.  They also

3    distributed bomb-making instructions.  And in fact at one point

4    Mr. Matthews got a request from an individual in France that

5    was someone else who was tied to, who we believe was tied to

6    ISIS.  And he asked Mr. Molina to have Mr. Molina send Mr.

7    Matthews the bomb-making instructions.  And Mr. Mr. Matthews

8    sent these bomb-making instructions to France believing they

9    would be used for an attack.

10            THE COURT:  M-hm.

11            MR. ROOMBERG:  Because of that --

12            THE COURT:  Were these specific particular plans

13    already in motion or was everything just thought about and

14    purchasing a few things?

15            MR. ROOMBERG:  It was discussed.  And bomb-making

16    instructions were passed around between each other and with

17    other members of the group.

18            THE COURT:  Okay.

19            MR. ROOMBERG:  So those steps were taken.  And

20    because of that, the terms of an enhancement, because this is

21    2339(b) and the terms of an enhancement under 3A1 -- or 3A4.1

22    is applicable, that's why the guidelines are so high.  It

23    automatically jumps to a criminal history category six.  And

24    a -- I believe when you have all the enhancements and the

25    leadership organizer, he was above a level 43.

1          THE COURT:  Okay.

2          MR. ROOMBERG:  So he went past the guidelines.  When

3    the guidelines are factored in with the statutory maximum,

4    that's how we get down from 360 to life down to 240.  We

5    believe at this point in time that's the applicable sentence.

6          THE COURT:  When did the federal agents decide it was

7    time -- what led them to decide, okay, it's time to go arrest

8    him?

9          MR. ROOMBERG:  The sending of the bomb-making

10   instructions to France.

11         THE COURT:  Okay.

12         MR. ROOMBERG:  At that point the decision was made to

13   charge both the defendants with conspiracy.

14         THE COURT:  And do you know how -- thank you.  Do you

15   know how long Mr. Matthews was engaged in this kind of activity

16   or conduct?

17         MR. ROOMBERG:  Two years.  Yeah, approximately two

18   years.

19         THE COURT:  Two years.

20         MR. ROOMBERG:  Two years.

21         THE COURT:  Well, he did a lot in two years.  And the

22   only reason we can surmise that there was no actual injury to a

23   person or property is that they were arrested.

24         MR. ROOMBERG:  The information was passed on to the

25   French authorities.

1          THE COURT:  M-hm.   Okay.   But nothing occurred here
2   in our country?
3          MR. ROOMBERG:   That is --
4          THE COURT:   Oh --
5          MR. ROOMBERG:   No, there were no attacks that were
6   actually carried out in our country.   There was bomb-making
7   instructions sent throughout country.
8          THE COURT:   Okay.
9          MR. ROOMBERG:   There was discussion about attacks
10  primarily between the two defendants that are here, Mr.
11  Matthews and Mr. Molina.   And that was all in the United
12  States.
13         THE COURT:   Okay.   Then -- and you're asking -- the
14  government is asking for 240 months.   Is this correct?
15         MR. ROOMBERG:   Yes, Your Honor.   We believe that in
16  this case that would be appropriate for the particular acts the
17  defendant did and for both the specific and general deterrence
18  for people participating in this type of --
19         THE COURT:   M-hm.
20         MR. ROOMBERG:   -- criminal and terroristic activity.
21         THE COURT:   So it's just not a thinking process that
22  these people went through.
23         MR. ROOMBERG:   That's correct, Your Honor. They took
24  action.
25         THE COURT:   And but they being arrested when they

1    were arrested, significant attacks would have occurred?

2              MR. ROOMBERG:  We believe they were in the planning

3    stages.  They had discussions about --

4              THE COURT:  And the government can't wait.  The

5    public can't wait until something happened.

6              MR. ROOMBERG:  We try not to.

7              THE COURT:  Right.

8              MR. ROOMBERG:  If an attack happens, then we've

9    already --

10             THE COURT:  Okay.  All right.  Mr. Wolf, do you wish

11   your client to speak first or do you want to speak first?

12             MR. WOLF:  Let me proceed, Judge.  I'll go first.

13             THE COURT:  Okay.

14             MR. WOLF:  Judge, when I first got appointed on this

15   case, this is the first terrorism case that I've been appointed

16   on that I handled.  And when I saw that it involved ISIS, I

17   questioned my ability to handle this case, me being Jewish.

18   And I had to search myself to see if I should ask to recuse

19   myself from this case.  But I decided that I could go beyond

20   that and adequately represent Mr. Matthews.

21             As I got into this case, I learned a lot about

22   algorithms.  And I never really thought that much about them.

23   I started listening to music on Pandora.  I like show tunes.  I

24   like -- I would listen to My Fair Lady or Camelot.  But then

25   they would send me other suggestions for other shows, Carousel

1    or what have you.  And I never thought much of it because these

2    are things that I enjoyed.  And the same thing happens when we

3    go on websites like Amazon, and we order a book.  And they'll

4    send us notices saying, hey, how about this book.  You were

5    interested in this one.  What about this one?  And then, you

6    know, I continued to think about it.  And I would go on the

7    internet, and I would Google something.  And, again, based on

8    what I looked into, I'll get things back from them.  So, you

9    know, we have heard about TikTok and what's going on with young

10   girls and all that.  It's really a devious situation, what's

11   going on, on the internet.

12          Well, as I said, I was concerned about prejudice.  My

13   prejudice.  I lived through 9/11.  I watched those twin towers

14   get hit.  I was affected by those.  But that holds true, you

15   know, in our society whether it's Islama phobia or antisemitism

16   or any Latin or any Asian or xenophobia.  We have to deal with

17   these baseless prejudices that we all hold and go beyond them.

18   My approach to this case was to learn as much as I could about

19   Kristopher.  And, fortunately, I was able to get information

20   from his grandmother who lives in South Carolina.  She's ill.

21   She is not well.  But she had access to family items, and I

22   tried to share those things with the court in my memorandum.

23   And I wanted to be able to know who Kristopher Matthews was and

24   who Kristopher Mr. Matthews is.

25          And as I set forth in my pleadings, Kristopher got

```
 1   sucked into a rabbit hole, unfortunately, based on his
 2   background.  And the good part of all of this was when an agent
 3   up in Minnesota tried to get him to turn on U.S. citizens, he
 4   said, well, I can't do that.  That's against my principles.
 5   And because of that, because of that, he woke up.  He woke up.
 6   He realized that this ISIS business was wrong.
 7             THE COURT:  When did he realize that?
 8             MR. WOLF:  When -- when was that when you were
 9   Minnesota?
10             DEFENDANT MATTHEWS:  I would have to guess -- I would
11   say maybe a few months.
12             THE COURT:  Before he was arrested.
13             MR. WOLF:  Oh, yeah, it was before he was arrested.
14             THE COURT:  Yeah, I figure if a federal agent comes
15   to your door knocking, you have to think, wait a minute.  It
16   doesn't sound like this is a good deal.
17             MR. WOLF:  Right.
18             THE COURT:  Go ahead.
19             MR. WOLF:  So anyway at that point he decided that
20   this is wrong.
21             THE COURT:  What choice did he have at that point?
22             MR. WOLF:  Well, he had to deal with it morally,
23   internally, where he's going to go with this.
24             THE COURT:  Right.
25             MR. WOLF:  And I got involved in this after he was
```

1   arrested in Tennessee.

2           THE COURT:  Tennessee.

3           MR. WOLF:  And the process began in Tennessee.  And

4   from -- or before I got involved in the case, Kristopher was

5   reaching out.

6           THE COURT:  M-hm.

7           MR. ROOMBERG:  Your Honor, may I have a word with

8   Mr. Wolf, please?

9           THE COURT:  With who?

10          MR. ROOMBERG:  With counsel.

11          THE COURT:  Yes.

12          (Attorneys discuss Off-the-record.)

13          MR. WOLF:  So since that time, you know exactly what

14  I'm talking about, and Kristopher is back to square one in

15  terms of his moral compass, and he knows exactly where he is

16  and where he wants to go.  And you've got documentation to that

17  both from him and his grandmother and other folks.  I know the

18  sentencing guidelines and goals are where they are.  But this

19  statute, you know, came into play on the heels of 9/11.  It

20  wasn't vetted the way it should be.  I set all that out in my

21  memo.

22          So I think I've given the court enough fodder to vary

23  or depart from those 240 months.  I think in the bottom -- the

24  end of my sentencing memo, I left out the word "more" on page

25  23.  I meant to say no more than.  Not more than.  But no more

 1   than.

 2            THE COURT:  Right.

 3            MR. ROOMBERG:  And I –– it's in your hands.  You have

 4   all the information in front of you, Judge.  And I'd ask that

 5   you –– I was hoping that the government would step forward

 6   earlier.  But they haven't.  There's nothing to say they will.

 7   But there's a hope.  And but you can do something at this

 8   point, as you know.  As far as where he would like to be

 9   housed, he would like to go back to the east cost in South

10   Carolina close to his grandmother so she could see him.  I

11   understand there's a facility in Edgefield in South Carolina.

12            THE COURT:  M–hm.

13            MR. WOLF:  There's another facility in Butner in

14   North Carolina, which is not far from ––

15            THE COURT:  Either Carolina.

16            MR. WOLF:  Yes, yes.

17            THE COURT:  Okay.

18            MR. WOLF:  And with that, Judge, I'll turn it over to

19   Mr. Matthews.

20            THE COURT:  Okay.  Mr. Matthews.

21            DEFENDANT MATTHEWS:  Yes, sir.  How are you doing,

22   Your Honor?

23            THE COURT:  I'm sorry.

24            DEFENDANT MATTHEWS:  Yes, sir, how are you doing?

25            THE COURT:  How am I doing?

```
1              DEFENDANT MATTHEWS:  Yes, sir.
2              THE COURT:  Ask me around 3:30.  It's too early in
3    the day.  Go ahead.
4              DEFENDANT MATTHEWS:  Yes, sir.  I would like to say,
5    Your Honor -- Your Honor, I have a lot to say.  But I'm going
6    to make this real briefly as possible.
7              THE COURT:  No, no.  That's why they give us life
8    tenure.  Go ahead.
9              DEFENDANT MATTHEWS:  You know, I planned this for a
10   long time, what I'm going to say, how I'm going to approach
11   this situation.
12             THE COURT:  You're going to do what?
13             DEFENDANT MATTHEWS:  You know, I spent a long time
14   deciphering in my mind how I would approach this situation with
15   you concerning this case of mine and how important you are in
16   this situation or in my life.  I'll try to be brief with
17   everything I touch on.  And as far as Mr. Wolf was saying, you
18   know -- you know -- and Mr. Roomberg.  And I know his job.  And
19   it's nothing personal.  I know his job is to, you know, get the
20   maximum prosecution and conviction.  I understand his status.
21   However, there was a little holes in some of his story, which,
22   you know, I was patient to wait to talk to you about as far as
23   attacks.  There were no specific planned attacks against any
24   American citizens in the United States.  Specifically, I didn't
25   want to bring up who, but since Mr. Wolf kind of brought it up,
```

1    we were -- you know, we had agents on our case, not Ms. Shannon

2    or nobody.  And I hold the highest regard for Ms. Shannon and

3    Mr. Mark who I've got to know a lot personally.  We were

4    coerced to make attacks.  And I brought that to their attention

5    in the beginning.

6                THE COURT:  Who coerced you?

7                DEFENDANT MATTHEWS:  The agents that were on our case

8    that were posing as Muslim.  They -- we were coerced to make

9    attacks, and I specifically denied on trying to make any

10   specific attacks in the United States.  And that my goal was to

11   travel to Syria.  I had no intentions of making any blatant

12   attacks against any innocent person in the country that I was

13   born in, Your Honor, so I just want to make that clear to you.

14          I got sucked into the Islamic state by a group of

15   individuals.  In the beginning it was just about seeking

16   religious knowledge.  During the course of seeking the

17   religious knowledge, we were brought about of the atrocities

18   that were happening around the world to the Muslims,

19   particularly innocent Muslims who had no involvement of

20   fighting militarily speaking, particularly children and places

21   such as Syria with a Syrian ruler who has systematically bombed

22   children daily and has left the country in one of the worst

23   displacements on the face of the earth, which is Syrian and

24   plus people that are displaced and are now refugees, many of

25   them women and children.  And I was shown videos of children

```
1    being bombed and attacked.
2              THE COURT:  Let me ask you something.
3              DEFENDANT MATTHEWS:  Yes, sir.
4              THE COURT:  Who was being bombed?
5              DEFENDANT MATTHEWS:  The children in Syria.
6              THE COURT:  M-hm.
7              DEFENDANT MATTHEWS:  Yes, sir.
8              THE COURT:  And, yeah, that's -- I haven't finished.
9    Those were all commas.
10             DEFENDANT MATTHEWS:  Yes, sir.
11             THE COURT:  Okay.  Go ahead.
12             DEFENDANT MATTHEWS:  Yes, sir.  So just and, you
13   know, I'm a very passionate person.  I have --
14             THE COURT:  You're what?
15             DEFENDANT MATTHEWS:  Passionate.  And I have a lot of
16   compassion.  So when I was shown those images, you know, it
17   broke my heart.
18             THE COURT:  M-hm.
19             DEFENDANT MATTHEWS:  And I naturally -- I was angry.
20   I felt like that the world had turned a blind eye to what was
21   happening to those children overseas.  And I engaged in a
22   selfless pursuit to go and try to go to Syria to try to defend
23   those people that were being attacked.  And I got sucked into
24   the ISIS --
25             THE COURT:  Why would you want to plant -- plant
```

1  bombs and all those things here in the United States?

2          DEFENDANT MATTHEWS:  Oh, well, that's the thing, Your

3  Honor.  We never planned on planting any bombs in any malls or

4  anything.  We never -- we never did any of those things.  No,

5  sir.

6          THE COURT:  All right.  Go ahead.

7          DEFENDANT MATTHEWS:  So, you know, so on and so forth

8  in the videos and stuff.  That's, you know, I started going

9  down the path of what -- extremism.  It wasn't towards -- right

10 before my arrest that -- and so just also to correct

11 Mr. Roomberg, it wasn't two years that I was into this

12 ideology.  It was one year.  And during the course of -- right

13 before my -- well, I would say maybe a little over a year, not

14 two years.  A little over a year.  So before my arrest, I met a

15 sister who was telling me about -- well, she was actually a

16 prisoner in Syria.  And she made it back to her home country.

17 And she was telling me about the corruption in the Islamic

18 state and different things that were taking place.  And so I

19 took the initiative to speak up against certain ideologies with

20 the group I was with.  I started bringing issues up that I was

21 concerned about.  And in other words, me -- I'm like you, Your

22 Honor.  I want the truth.  I'm sure you spent your whole life

23 persevering to be a judge because you want justice and you want

24 the truth of people, so that's the same thing I was seeking.

25 So if I felt like something was wrong, I started questioning

1   things.  That's always how I was growing up.  I would question

2   things, if something didn't seem right.

3           So -- and during my arrest I said, you know what, I

4   felt like this was a testimony for God to -- for me to wake up

5   out of what I was going through.  You know, I spent a lot of my

6   life, you know, going down the wrong path, being involved with

7   the wrong people.  Gang life.  Substance abuse.  I didn't have

8   much role models -- excuse me, so I felt like God was the

9   answer for me to bring me out of the darkness that I was in

10  growing up.  And a lot of the things I went through to my

11  family and so on and so forth.  So, yes, Your Honor, you know,

12  I made mistakes.  I have totally denounced the Islamic state.

13  I have realized that I'm in a selfless pursuit to, you know,

14  help people now.  I said, well, you know, I used to ask myself,

15  I said, well, you know, I was going through things, substance

16  abuse, family problems.  I said, well, you know, why is God

17  allowing me to go through these things?  So I was like, now,

18  it's like I realize it now, so that all the atrocities that I

19  went through personally in my life, now I can give back.  I can

20  give back to people.  So I can, you know, help people from not

21  going down the same road I went down or making the same

22  mistakes that I made.  I have made a pledge to be a

23  motivational speaker upon my release out of imprisonment to

24  help non-Muslims and Muslims alike from anywhere from getting

25  away from gang life, substance abuse, Muslims who may become

```
1   radicalized or going down an extreme path.  I have tooken (sic)
2   all those things into consideration.  I said, well, you know,
3   that's how I can help people get back.
4          Also, Your Honor, I wanted to say that I didn't want
5   to waste my time in Karnes so.
6          THE COURT:  Waste your time where?
7          PROBATION OFFICER:  In Karnes.
8          THE COURT:  What's wrong with Karnes?  It's a good
9   county.
10         DEFENDANT MATTHEWS:  Well, it's a good county.  But,
11  you know, a lot of the guys there waste their time.  And, you
12  know, we had access to programs.
13         THE COURT:  M-hm.
14         DEFENDANT MATTHEWS:  So I took the initiative to take
15  numerous programs.
16         THE COURT:  Okay.
17         DEFENDANT MATTHEWS:  That has actually, you know,
18  really helped me a lot.  So, you know, a lot of facilities have
19  the term corrections.  Well, a lot of prisoners need to
20  understand that the term correction is something where when
21  you're in prison you should take the initiative and the
22  opportunity to rehabilitate yourself in whatever area you need
23  to rehabilitate yourself in.  And so I took that initiative to
24  take those programs to help myself as much as possible and not
25  waste idle time.  And as the saying goes, idle hands is the
```

1   devil's playground.  So I was in constant pursuit to change my

2   attitude.  Change my thinking.  My grandmother said, you know,

3   she said, my attitude hasn't been this great since God knows

4   when.  You know, I asked her yesterday or the other day I said,

5   I said, well, how would you rate my attitude?  I said one to

6   ten.  She said, well, definitely a ten.  She said you talk to

7   me a lot more now.  You're not distant from me.  And I said,

8   you know, those things really, really put a smile on my face.

9   My grandmother, she needs a lot of help.  My son needs a lot of

10  help.  So, you know, and in my selfless pursuit, I know now

11  it's not about me.  It's about giving back, giving back to my

12  community.  Giving back to the country I was born in.  And most

13  importantly giving back to myself.  I owe myself a lot of work

14  to do as far as self-development because for many years I sold

15  myself short in different ways.

16          Even in this situation, getting caught up in this

17  situation, I was, you know, going down, which I was led to

18  believe was -- you know, I was a, you know, hero.  I had a

19  chance to be a hero.  It's like, well, now I come to find out

20  I'm back down a dark road.  So now I'm out those dark roads.

21  Now I'm back in the sunlight.  The program that stuck to me the

22  most in the -- in Karnes that I was taking up was the peace

23  program.  And it says what is peace?  It says peace is the

24  ability to live in harmony with mankind.  Peace is tranquility

25  in the mind.  Peace is harmony in the heart.  Peace is to be

1   merciful and to social shift sincere compassion.  Peace is

2   God's greatest attribute.  The beneficent, the merciful.  In

3   order to achieve peace one must start within.  And it is within

4   us that we obtain this most beautiful gift that he gives inside

5   us all.  And if we only open our eyes, I'd choose the path of

6   peace, and I'd choose the path of God.

7           So, Your Honor, the peace program was very, very good

8   to me.  I took about 40 programs.  Also, Your Honor, I was

9   watching court cam TV, and there was a South Carolina judge and

10  he was giving the sentence.

11          THE COURT:  A what now?

12          DEFENDANT MATTHEWS:  Court cam TV.

13          THE COURT:  Okay.  What about it?

14          DEFENDANT MATTHEWS:  Yes, sir.  And I was talking --

15  -- I'm sorry, and the judge was talking to the defendant.  And,

16  well, the whole court, and he says -- he said, it's easy to

17  give the man the max.  But to give someone a second chance is

18  our own reflection on mercy that all human beings should have

19  despite our faults and mistakes.  So just because we fall down

20  in life and stumble, and it could be a lot of times that we

21  fall down, it doesn't mean we're lost forever.  As long as

22  we're alive and we're breathing, there's always hope.  And a

23  messenger of God, he stated that, you know, if we want to have

24  mercy in our lives, if we want God to have mercy in our lives,

25  we got to first display mercy to others.  So I ask you, Your

1    Honor, today to for my sake and your sake and -- or for God's

2    sake to open your heart and have mercy and be willing to give

3    me a second chance, Your Honor.

4                    THE COURT:  M-hm.

5                    DEFENDANT MATTHEWS:  Yes, sir.

6                    THE COURT:  All right.  So let me ask you.

7                    MR. ROOMBERG:  Your Honor.

8                    THE COURT:  You said everything you wanted to say?

9                    DEFENDANT MATTHEWS:  Yes, sir.

10                    THE COURT:  Okay.  Mr. Roomberg.

11                    MR. ROOMBERG:  Your Honor, a couple of things.

12    First, this statement about being approached by an FBI agent in

13    Minnesota.  None of the case agents know about it.  They've

14    just queried the original case agent from South Carolina.  They

15    never heard about that either.

16                    THE COURT:  All right.

17                    MR. ROOMBERG:  But more importantly, while I

18    appreciate Mr. Matthews correcting me on him not wanting to

19    plan attacks, when we read the factual basis that he signed,

20    when he talks about where he admitted to discussions on

21    May 25th, 2020 where he himself stated a preference for hitting

22    government buildings or places of interest, like economic

23    centers, like the stock market or CIA headquarters or attacking

24    FBI or DEA headquarters.  I would hit places like to send a

25    message.  Another one. He offered other possible locations such

```
 1    as state buildings, social security buildings, the stock market
 2    or Trump Tower in New York.  He then mentions about they could
 3    also do sniper attacks and discussed the Washington, D.C.
 4    sniper attacks from the past.
 5               THE COURT:  M-hm.
 6               MR. ROOMBERG:  And while he says at some point they
 7    do want to go overseas to fight for ISIS, he says if that
 8    doesn't work out, we'll come back and do it in the Homeland.
 9    So this is in the factual basis.  So while I appreciate his
10    correction, clearly they discuss planning attacks in the United
11    States.  They did send bomb-making materials.  There's no basis
12    to go below the 240.  We understand it's certainly within the
13    court's power to do so.
14               THE COURT:  All right.  Mr. Wolf, do you wish to say
15    anything now that you have heard the prosecutor mention a few
16    other things?  Do you -- you don't have to.  I'm just saying do
17    you want to say anything.  And I'll ask you Mr. Matthews in a
18    moment.  Mr. Wolf.
19               MR. WOLF:  I'm just going to leave it as it is,
20    Judge.  I'll just leave it.
21               THE COURT:  Okay.  Mr. Matthews.
22               DEFENDANT MATTHEWS:  Yes, sir.  Mr. Garcia,
23    Mr. Roomberg is correct. I did sign these papers in the
24    beginning.
25               THE COURT:  And it's not Mister.  It's Judge.
```

1           DEFENDANT MATTHEWS:  Judge.  Yes, sir.  Yes, sir.

2           THE COURT:  You can call me other things.

3           DEFENDANT MATTHEWS:  Pardon me.  Yes, sir.  But,

4    yeah, Mr. Roomberg, he's correct.  I did sign those papers.

5    However, I was in the process of reaching out to cooperate with

6    these agents next to us.  Ms. Shannon and Mr. Mark.  When they

7    brought -- when the officers brought those --

8           THE COURT:  You're saying before you were apprehended

9    or after you were apprehended?

10          DEFENDANT MATTHEWS:  After.  Yes, sir.

11          THE COURT:  M-hm.  Go ahead.

12          DEFENDANT MATTHEWS:  And, you know, the way they went

13   about bringing those -- and I mentioned it to Mr. Wolf, the way

14   they brought those papers into our dorm and -- you know, I

15   wasn't in PC or, you know, I was in the general population tank

16   where my safety was at jeopardy.  So they brought in the

17   paperwork in front of everybody.  I had not time to look over

18   it or anything.  You know, I got all these prisoners, you know,

19   around me.  And right there by the microwave, just right there

20   about you by the door.  I remember it like it was yesterday.

21   And I had no choice but to sign right there because they would

22   note taking me to a legal building where I can sign in peace

23   and look over everything, to dispute anything.

24          THE COURT:  Well, do you dispute anything now, now,

25   that you know.

1          DEFENDANT MATTHEWS:  Oh, yes, sir.  He's insinuating

2    that we were planning attacks, and we said specifically we

3    didn't want -- what she is not mentioning, which they have it.

4    They have the information.

5          THE COURT:  You mean you were not planning all these

6    horrific things or even one of them?

7          DEFENDANT MATTHEWS:  We were not planning any

8    attacks.

9          THE COURT:  What, did y'all get together and talk

10   shop?

11         DEFENDANT MATTHEWS:  And just talk shop, Your Honor.

12         THE COURT:  I'm going to ask you something.

13         DEFENDANT MATTHEWS:  Yes, sir.

14         THE COURT:  You're 34 or 35, right?

15         DEFENDANT MATTHEWS:  Thirty-six.  Yes, sir.

16         THE COURT:  Why couldn't you have done other things

17   like you want to help children either in Syria or here.

18         DEFENDANT MATTHEWS:  Yes, sir.

19         THE COURT:  Help them.  You could have done any

20   number of things instead of engaging in this horrific nonsense.

21   You understand it's nonsense.  Right?

22         DEFENDANT MATTHEWS:  I was a knucklehead, Your Honor.

23   Yes, sir.

24         THE COURT:  I'm not saying knucklehead.

25         DEFENDANT MATTHEWS:  Yes, sir.  It was nonsense.

1    Yes, sir.

2              THE COURT:  With deadly consequences sometimes.  And

3    there was no deadly consequences in this case.

4              DEFENDANT MATTHEWS:  Yes, sir.

5              THE COURT:  Only because you were arrested.

6              DEFENDANT MATTHEWS:  Yes, sir.

7              THE COURT:  Are we to assume that if you had not been

8    arrested, that you would have just been talking and speaking

9    like this, and you would have never planted a bomb?  You would

10   have never killed someone.

11             DEFENDANT MATTHEWS:  Well, Judge Garcia, the fact

12   that right before I was arrested I was starting to have a

13   change of heart, and I was already disputing what these people

14   I was with.  I was already coming out of that path.

15             THE COURT:  Okay.  Fine.

16             DEFENDANT MATTHEWS:  Yes, sir.

17             THE COURT:  But couldn't you have done other things?

18             DEFENDANT MATTHEWS:  Yes, sir.

19             THE COURT:  More valuable, more helpful to a

20   community like in this town in this city?

21             DEFENDANT MATTHEWS:  Yes, sir.

22             THE COURT:  There's many, many needs.

23             DEFENDANT MATTHEWS:  I understand.

24             THE COURT:  Now, you grew up in South Carolina,

25   right?

1          DEFENDANT MATTHEWS:  Yes, sir.

2          THE COURT:  Okay.  There's needs everywhere.

3          DEFENDANT MATTHEWS:  Yes, sir.

4          THE COURT:  Now, let me ask you.  How were you

5    employed prior either to engaging in this nonsense or after?

6    How were you employed during the time you were involved with

7    this horrific nonsense?

8          DEFENDANT MATTHEWS:  Employment, you said.

9          THE COURT:  Yeah.

10          DEFENDANT MATTHEWS:  Oh, I was working for a moving

11    company.

12          THE COURT:  And did your employer know that you

13    dabbled in all of this stuff?

14          DEFENDANT MATTHEWS:  No, sir.  I kept everything

15    hidden.

16          THE COURT:  M-hm.

17          DEFENDANT MATTHEWS:  Yes, sir.

18          THE COURT:  And how many hours did you work a week?

19          DEFENDANT MATTHEWS:  I would say roughly maybe just

20    typical.

21          THE COURT:  Forty.

22          DEFENDANT MATTHEWS:  Forty.  Yes, sir.

23          THE COURT:  So assuming you worked the 40 hours and

24    did nothing to aid and abet this nonsense, that left you a --

25    very few hours.  You got to sleep.  You got to eat.  So when

```
1    did you have time to engage in this nonsense?

2            DEFENDANT MATTHEWS:  I guess traveling.  We travel

3    state to state.  I guess during the course of travel.

4            THE COURT:  To do what?  You travel to do what?

5            DEFENDANT MATTHEWS:  We did long haul moving company

6    through the moving company state to state.

7            THE COURT:  I just don't understand --

8            DEFENDANT MATTHEWS:  Yes, sir.

9            THE COURT:  -- how you could have occupied your time.

10           DEFENDANT MATTHEWS:  Yes, sir.

11           THE COURT:  More importantly for so many needs in

12   this city, in any city.

13           MR. WOLF:  And, Your Honor.

14           THE COURT:  So many needs.

15           DEFENDANT MATTHEWS:  Yes, sir.

16           THE COURT:  I don't get it.

17           DEFENDANT MATTHEWS:  You're absolutely correct, Your

18   Honor.

19           THE COURT:  And another thing.

20           DEFENDANT MATTHEWS:  Yes, sir.

21           THE COURT:  I didn't hear during your soliloquy or

22   allocution--

23           DEFENDANT MATTHEWS:  Yes, sir.

24           THE COURT:  -- which was almost 21 minutes.

25           DEFENDANT MATTHEWS:  Yes, sir.
```

1           THE COURT:  There was no hint of remorsefulness?

2           DEFENDANT MATTHEWS:  Yes, sir.

3           THE COURT:  None.  None.

4           DEFENDANT MATTHEWS:  I take full responsibility, Your

5    Honor.

6           THE COURT:  Are you kidding me?  None.  Now, I did

7    listen to you.

8           DEFENDANT MATTHEWS:  Yes, sir.

9           THE COURT:  I never stopped you.

10          DEFENDANT MATTHEWS:  Yes, sir.

11          THE COURT:  In fact, I've asked you to -- if you

12   wanted some more time, and you took a little time.  But I heard

13   no remorsefulness.  No apology to the country.

14          DEFENDANT MATTHEWS:  Well.

15          THE COURT:  None.  Zero.

16          DEFENDANT MATTHEWS:  Yes, sir.

17          MR. WOLF:  Just wait till he finishes.

18          THE COURT:  I guess you didn't take that training

19   class in Karnes.  Go ahead.

20          DEFENDANT MATTHEWS:  Yes, sir.  No, let me say I did

21   leave that out.  And I told myself, you know, that's the first

22   thing I would say, but I kind of got a little sidetracked.  I

23   have total remorse for my actions, Your Honor.

24          THE COURT:  Well, I'm glad to hear it.

25          DEFENDANT MATTHEWS:  Yes, sir.  And that's why I

1    brought up the fact that, you know, I want to give back to my

2    community and country because I want to take responsibility for

3    my actions and become the man that my son needs me to be and my

4    grandmother wants me to be.  So I am extremely remorseful for

5    my actions.  It's very shameful for the things that I was

6    engaged in.  I'm actually ashamed of the things I was engaged

7    in.  I know my mother doesn't really understand a lot, so she

8    doesn't talk about it.  But if she did, I would tell her just

9    like I told you, the truth.  And no matter how shameful it is,

10   the truth is the truth.  And I'm absolutely remorseful for all

11   my actions, Your Honor.  Yes, sir.

12           THE COURT:  Is that it?

13           DEFENDANT MATTHEWS:  Yes, sir.

14           THE COURT:  Okay.  The court has considered the

15   guidelines in an advisory capacity.  And pursuant to the

16   Sentencing Reform Act, the policy statements, including grounds

17   for departure, U.S. versus Booker and Gall versus U.S. and

18   reviewing the 18 USC 3553 factors, has considered the

19   guidelines as an initial benchmark and frame of reference.  And

20   finds that the guideline range is appropriate in this case and

21   sentences Kristopher Sean Matthews to the custody of the Bureau

22   of Prisons for 20 years or 240 months.

23           The court considers the 240-month sentence, which is

24   within the guideline, as sufficient to address the sentencing

25   objectives and punishment and general deterrence -- it is

1  ordered defendant shall pay the special assessment of the
2  $100 -- don't worry about the $100.
3         The defendant shall notify the U.S. attorney in this
4  district or in the district he resides, 30 days of any change
5  of address that occurs while the portion of the sum.  There's
6  no fine imposed given that you're not able to pay a fine.
7         Upon release from imprisonment, the defendant shall
8  be placed on supervised release for a term of three years,
9  which is totally inadequate.  But I can't do more than three
10 years.  While on supervised release, the defendant shall comply
11 with the mandatory and standard conditions issued by this court
12 on November 28, 2016.
13        In addition, the defendant shall also comply with the
14 following special conditions.  And let me read them into the
15 record.  And, Mr. Matthews, if anyone -- if you don't clearly
16 understand any of these, please tell me.
17        One:  The defendant shall participate in a substance
18 abuse treatment program and follow the rules and regulations of
19 that program.  The program may include testing and examination
20 during and after the program completion to determine if the
21 defendant has reverted to the use of drugs.  The probation
22 officer shall supervise the participation in the program.
23        During treatment, defendant shall abstain from use of
24 alcohol and any and all intoxicants.  Defendant shall pay for
25 these services, if financially able to do so.

1          The defendant shall submit to substance abuse testing

2   to determine if the defendant has used a prohibited substance.

3   The defendant shall not attempt to obstruct or tamper with the

4   testing methods.  The defendant shall pay the costs of testing,

5   if financially able to do so.

6          Next:  The defendant shall not communicate or

7   otherwise interact with any known member of the Gangster

8   Disciples Gang.  I'm not even going to ask what it is.

9          Next:  The defendant shall submit his person,

10  property, house, residence, vehicle, papers, electronic

11  devices, computer, his office to a search conducted by a U.S.

12  probation officer.

13         Failure to submit to a search may be grounds for

14  revocation of release.  The defendant shall warn any other

15  occupant that the premises may be subject to searches pursuant

16  to this condition.

17         The probation officer may conduct a search under this

18  condition only when reasonable suspicion exists and that the

19  defendant has violated a condition of supervision and the areas

20  to be searched contain evidence of this violation.

21         Any search shall be conducted at a reasonable time

22  and reasonable manner -- actually, that doesn't even make

23  sense.

24         DEFENDANT MATTHEWS:  No, sir.

25         THE COURT:  I mean, everybody knows the FBI goes

1    knocking on doors at 6:30 in the morning.  Okay.  Fine.

2              The defendant shall participate in a mental health

3    treatment program and follow the rules and regulations of that

4    program.  The probation officer in consultation with the

5    treatment provider shall supervise participation in the

6    program, that is, the provider, location, modality, duration

7    and intensity.

8              Defendant shall pay the costs of these -- of this

9    treatment, if financially able to do so.  The defendant shall

10   take all mental health medications that are prescribed by the

11   treating physician.  Defendant shall participate in an

12   educational service program and follow the rules and

13   regulations of the program.  Such programs may include high

14   school equivalency preparation.  English as a second language.

15   Classes or other classes designed to improve defendant's

16   proficiency in the skills such as reading, writing,

17   mathematics, or computer use.

18             Defendant shall pay for these services, if

19   financially able to do so.  Finally, the defendant shall

20   participate in a vocational service program and follow the

21   rules and regulations of that program.  Such a program may

22   include job readiness training and skills development training.

23   The defendant shall pay for these services, if financially able

24   to do so.

25             The court has accepted the plea agreement.  It is

1    satisfied that the agreement adequately reflects the

2    seriousness of actual offense behavior and that the acceptance

3    of plea agreement will not undermine the statutory purpose of

4    sentencing.  The court advises defendant that he has a right to

5    appeal this sentence imposed in this case, unless as part of a

6    plea agreement he has waived that right.

7              The court will order this presentence report be

8    sealed.  Made part of the record.  Should the application of

9    the guidelines be appealed, the presentence report will be

10   available for review for appellate purposes any -- if any.

11             Mr. Roomberg, anything to add?

12             MR. ROOMBERG:  Yes, Your Honor.  We would move to

13   dismiss Count Two at this time.

14             THE COURT:  Okay.  Anything else?

15             MR. ROOMBERG:  No, sir.  Thank you.

16             THE COURT:  Mr. Wolf, anything on your behalf or your

17   client's behalf?

18             MR. WOLF:  Judge, in light of his grandfather's

19   death, Mr. Matthews never really had grief counseling.  And it

20   still upsets him to this day.  We'd ask that that be included,

21   that form of counseling be included.

22             THE COURT:  Yes, of course.  And hopefully the

23   facility he ends up at may have that kind of counseling.  It

24   might be that involved.  Mr. Matthews, have you understood

25   everything here today?

```
1              DEFENDANT MATTHEWS:  Yes, sir.

2              THE COURT:  Okay.  Good.  We're going to take a five

3    or ten-minute recess.

4              THE COURT SECURITY OFFICER:  All rise.

5              (Adjournment.)
```

```
1   UNITED STATES DISTRICT COURT   )

2   WESTERN DISTRICT OF TEXAS      )

3              I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5              I further certify that the transcript fees and format

6   comply with those prescribed by the Court and the Judicial

7   Conference of the United States.

8              Date signed:   September 8, 2022.

9
                          /s/ Leticia Lucia Ornelas
10                        United States Court Reporter
                          262 West Nueva Street, Room 1-400
11                        San Antonio, Texas 78207
                          (210) 244-5039
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```